(Clarke County, Ohio Probate Court.)

## ALBERT H. KUNKLE, ASSIGNEE, v. CHARLES A. REESER.

(1.) A divorced man living with an unmarried minor son, is a widower within the meaning of section 5435 & 5441, and is entitled to the homestead exemptions therein provided.

(2.) In cases of assignment, the facts existing at the time the assignment is made, control where an exemption is claimed under section 5435,5438 and 5441.

(3.) When it is claimed under section 5440, the facts existing at the time the order of distribution is made, probably control.

(4.) a When a material man furnishes suitable material to a person who he knows is erecting a building, the law presumes that the materials are furnished for that building.

(5.) b Likewise it will presume that the material man intends to retain the right the law gives him of a lien for the materials furnished.

(6.) c He will not lose such right unless

there is an agreement or understanding to that effect.

(7.) *d* There must be sometihng more than mere knowledge that a building is being built and the supplying of orders for suitable materials in order to constitute a "continuing," "subsisting" or "entire" contract within the meaning of the Mechanic's Lien Law.

(8.) *f* The mere fact of giving a promissory note, will not be a waiver of the lien.

(9.) *g* If the note is negotiated and the owner still remains liable as indorser thereon, the lien will not be waived.

(10.) *h* It is sufficient if the original payee has possession and is the owner of the note at the time the order of payment is made on the lien.

(11.) *i* If enough appears in the description of the premises to enable a party familiar with the locality to identify the premises intended to be described with reasonable certainty to the exclusion of others, it will be sufficient.

(12.) *k* When a mechanic's lien is filed after the deed of assignment, and the affidavit states that the contract is not in writing, the amounts and times of payment thereunder need not be stated.

(13.) *l* Query. Is it necessary in any case where the contract is not in writing to state the "amounts and times of payment thereunder", in the affidavit for a mechanic's lien?

(14.) *e* Where a builder informs a material man that he intends to build and desires him to furnish the lumber, even though no price is agreed upon or time of payment, and the articles are furnished as ordered, from time to time, the contract is entire.

(15.) In order that the acceptance of a promissory note may be a waiver of a mechanic's lien, because it extends the time beyond the period at which a lien could be fixed, it must be so drawn that it is not due until more than four months after the work has been performed, or the last item furnished.

(16.) *m* When the affidavit states that the materials were furnished in and about the "alteration" of a house, and the evidence shows they furnished in the "erection", the variance is not sufficient to affect the lien.

ROCKEL, J.

A number of questions have been submitted to the court in the above matter, the first of which that will be considered is, whether Charles A. Reeser, the assignor, is entitled to $500.00 in lieu of homestead exemption, out of the proceeds of the sale of real and personal property now in the hands of the assignee.

Charles A. Reeser, the assignor, files the following application which, as it contains a correct statement of the facts as appears from the evidence except that the assignor was a divorced man at the time of the assignment, is quoted in the entirety.

"And now comes the said assignor, Charles A. Reeser, and makes application for the payment to him of the sum of five hundred dollars, in lieu of a homestead, or set off allowed under the exemption laws of the state of Ohio, and says at the date of the assignment herein, he was a widower, living with an unmarried minor son: that in said assignment he reserved his right of exemptions under the laws of the state of Ohio, and that in the inventory and appraisement filed herein, in lieu of the set off to which he would be entitled, he reserved his right to make application for exemption, and that since said appraisement, he has become a married man, the head of a family, resident of the state of Ohio, and not the owner of a homestead, nor is his wife the owner of a homestead.

"He, therefore, asks that the court order the assignee herein to pay him the sum of five hundred dollars, out of the proceeds of the sale of the real estate, his homestead, sold under proceedings in this court, and if, by reason of liens, it is found that he is not entitled to homestead, that the same be paid to him out of the proceeds of the sale of other personal property.

"Chas. A. Reeser."

It will be proper to consider a number of sections of the Revised Statutes in deciding the questions raised by this application and the existing facts.

Sec. 5435 provides, "Husband and wife living together, a widow, or a widower living with an unmarried daughter or unmarried minor son, may hold exempt from sale, on judgment or order, a family homestead not exceeding one thousand dollars in value," etc.

Sec. 5440. "When a homestead is charged with liens some of which as against the head of the family or the wife, preclude the allowance of a homestead to either of them, and others of such liens do not preclude such allowance and a sale of such homestead is had, then after the payment, out of the proceeds of such sale, of the liens so precluding such allowance, the balance, not exceeding five hundred dollars, shall be awarded to the head of the family, or the wife as the case may be in lieu of such homestead upon his application, in person, or by agent or attorney."

Sec. 5441. "Husband and wife living together, a widower living with an unmarried daughter or minor son, every widow and every married female having in good faith the care, maintenance and custody of any minor child or children of a deceased relative, resident of Ohio, and not the owner of a homestead, may in lieu thereof, hold exempt from levy and sale real or personal property to be selected by such person, his agent or attorney, at any time before sale, not exceeding five hundred dollars in value, in addition to the amount of chattel property otherwise by law exempted."

Great care has been exercised by the legislature to preserve all exemptions provided by law to an assignor.

Section 6348 provides, "No assignment

for the benefit of creditors shall be construed to include or cover any property exempt from levy or sale on execution, or from being by any legal process applied to the payment of debts, unless in the assignment the exemption is expressly waived, or any property belonging to the wife of the assignor, nor to require the assignor to deliver up any of such property: and as to the homestead exemption, and exempt property that has to be selected by the debtor and his wife, the appraisers appointed by the court shall, on making the appraisement, set the same off in the same way that appraisers of property levied on or attached are required to do: and if, for any reason, this setting off is then omitted, the court may at any time thereafter and before sale, order the same to be done by the appraisers.''

And also in section 6351, after declaring that the court shall order the payment of all incumbranecs, fix priorities and contingent dower interests, it is provided: "But nothing in this section nor in section six thousand three hundred and fifty shall be construed as in any way to impair the right of homestead, or the mode provided by law for enforcing such rights.''

I think there is but little doubt but that in the case at bar "the homestead is charged with liens'' so as to "preclude the allowance of a homestead to either'' C. A. Reeser or his wife, and that after the payment of all liens thereon, there will be no balance from which a sum "not exceeding five hundred dollars'' could "be awarded to the head of the family or the wife, as the case may be, in lieu of such homestead''. Section 5440 has therefore but little application to the present case, except perhaps in an incidental way.

In applying the sections above quoted to the existing facts the following questions are presented:

1st. Was Reeser at the time he made the assignment a "widower living with an unmarried minor son''? or in other words, is a man divorced from his wife, a "widower'' within the meaning of the word as used in the homestead exemption statutes? In the general acceptation of the word and as defined by all leading lexicographers, "widower'' means a "man who has lost his wife by death''.

Reeser was a man who had lost his wife, not by death, but judicial decree, and therefore, if a strict construction be given to the statute, it can not be said that he comes within its terms.

But courts in considering these statutes providing for exemptions have invariably given to them a most liberal interpretation. In an early case it was said, "The humane policy of the homestead act seeks not the protection of the debtor: but its object is to protect his family from the inhumanity which would deprive its dependents members of a home, and in aid of this wise and humane policy, the whole act should re-

ceive as liberal construction as can be fairly given it.''

Sears v. Hanks, 14 Ohio St., 302.

This language is quoted with approval in Regan v. Zeeb, 28 Ohio St,. 485.

In that case it was held under a statute which provide that "any resident of Ohio, being the head of family, might hold exempt from execution,'' that when man and wife were living together the wife might make the demand. And yet it can hardly be said in the general acceptation of the term, that when husband and wife are living together, that the wife is the head of the family.

Lexicographers, in the absence of their wives, would hardly have given this as a correct application of the phrase, "head of the family.''

Here it was said "The argument is that the wife has no right to demand that this piece of property be exempted, because, by this statute, the right to make the selection is limited to the head of the family, his agent or attorney, and it is not extended to the wife * * We do not concur in this view of the wife's right under the statutes.''

The same liberal construction has been followed in other states. An unmarried woman keeping house, and there bringing up two children of her deceased sister. (Arnold v. Waltz., 53 Iowa, 706.)

A brother living with his widowed sister and her four small children, and providing for them, (Wade v. Jones, 20 Mo.,75). And a bachelor who supports a widowed sister that keeps house for him, (E. D. Mo., 16 Nat'l. Bank Reg., 328) have each been held to be the "head of a family'' and entitled to a homestead exemption. The reason for holding that a wife living with her husband is the "head of her family'' and entitled to demand and receive the homestead exemption, is no stronger, than that which exists for holding that a divorced man living, with an unmarried minor son is a "widower'' and entitled to claim the exemptions provided by statute.

The one is not a more liberal construction of our homestead laws than the other. The same reasons exist for each. These laws were not made to benefit the debtor: but to furnish a home for his family amid the surroundings of which his children would receive that protection, care and education which would lead them to lives of usefulness, wherein they might be an honor to themselves and an ornament to society.

The more homes we have, the better will be our people: The more children that are reared amid its influences, the better will be society, our country and its government.

And thus, while the benefit secured by the homestead laws, may inure directly to the parent and his children, the ultimate result will be to the good of our general public welfare.

There is no difference between the responsibilities resting upon a divorced man living with an unmarried minor son, and

therefore no reason exists why the legislature should provide for the one and exclude the other. The minor son is in need of as much care and attention in one case as in the other. Society is interested in one just as much as the other.

Neither does it require a very great straining of the English language to hold that a divorced man is a widower. True, it is not within the ordinary definition, but we find on examination that the word "widower" is derived from "widow", and that "widow" has a Sanskript derivation, meaning without a husband, or lack of a husband.

And therefore in its broadest terms a "widower" might be defined to be, "A married man who has lost his wife" either by death or judicial decree. The separation in the one case, from a legal point of view, is no more absolute than the other.

That a divorced man in the ordinary mind occupies a position in many respects analogous to a man who has lost his wife by death, is strengthened by the fact that modern society, has adopted a word, including the word which denfies a "man who has lost his wife by death", as descriptive of a divorced man.

The word "grass-widower" is not recognized as a standard word or even found in the older Lexicons, but it springs forth full fledged in the Century Dictionary, where it is defined to be "a man who for any reason, is living apart from his wife."

There being several kinds of widowers, it would not be a violent presumption, to presume that in the use of the general term, "widower," all were included; especially is this true where the same reasons exist for a like application to all.

I am therefore of the opinion, that a divorced man is a "widower" within the true spirit and meaning of sections 5435 and 5441. Revised Statutes, and is entitled to the exemptions therein provided for.

2. The second question for determination is, whether the right of the assignor to his exemption rest upon the facts existing at the time of the assignment, or upon those existing at the time the court orders a distribution. To properly answer these questions is a matter of no little difficulty, and may largely be controlled by the nature and condition of the property assigned, and the sections of the statute applicable thereto

At the time of an assignment the assignor may be the owner of the following kinds or classes of property,

First. Personal property only.

Second. Real estate not occupied as a homestead.

Third. Real estate occupied as a homestead but not encumbered by lien so as to preclude the allowance of a homestead therein.

Fourth. Real estate charged with liens some of which preclude the allowance of the homestead while others do not.

Fifth. Real estate charged with liens all of which preclude the allowance of a homestead.

If the property assigned is of the kind mentioned in the first, second and third, of the above classes, then the condition of facts existing at the time the assignment is made will control.

The deed of assignment conveys to the assignee rights at least equal to those acquired by an officer after having made a levy under sec. 5483. Each have the legal possession of the property; and for very much the same purpose, i. e. to convert it into money and apply it upon the debts of the owner.

In both cases the law preserves to the debtor the right to claim his homestead exemption, but it must be a right existing at the time of the levy or the assignment. It can not be created afterwards.

See Stafford v. Smith, 30 Bull., 288.

The supreme court in Selders v. Lane, 40 Ohio St., 34, and the circuit court in Nixon v. Vandyke 2 O. C. C., 63, have held that a judgment debtor cannot, after such levy and appraisement, either by occupation or marrying a wife and bringing her to reside thereon, acquire the right of a homestead.

In Selders v. Lane, the court say, "In this case at the time of the levy, he was admittedly not entitled to the exemption: And his claim based on his subsequent marriage, is neither within the letter nor spirit of the statute." In Wildermuth v. Koenig, 4 Ohio St., 18, the court says, "We are not compelled to resort to a liberal construction of these words to see that the legislature intended that real estate having the character of a homestead, when it is about to be levied upon, should be set off to the use of the debtor's family. A literal construction gives this meaning to them:" The court italizing the word "when".

If the property was of the kind designated in the fourth class under the ruling of the supreme court in Cooper v. Cooper, 24 Ohio St., 488, I am inclined to believe the facts existing at the time the fund is finally disposed of would control. It would then be governed by the provisions of section 5440, "and the rule then seems to be", say the circuit court in Nixon v. Vandyke, 2 O. C. C., 68, "as described in Cooper v. Cooper, 24 Ohio St., 485, that the judgment debtor is the head of a family, and therefore entitled to it, is to be determined as of the time of the order of distribution of such fund."

The court in Nixon v. Vandyke clearly recognize that here is a distinction in the application of the exemption law as found in sections 5435, 5438, 5441, and that provided in 5440.

In the case at bar the assignor at the time the assignment was made, was only the owner of property herein designated in Class 1, and 4 or 5.

According to the conclusions hereinbefore announced, the assignor not being in the condition of "husband and wife living together", at the time the assignment was made, should not, because he has since as-

sumed that relation, be entitled to $500.00 in lieu of a homestead out of Class 1.

But if the court should so decide, the questions made upon the alleged liens upon the real estate assigned, that if there should be a balance remaining in Class 4 after the payment of the valid liens thereon, the assignor would be entitled to the same as being now the "head of a family". Of course he could not receive in any case more than $500.00. As before herein stated, it is very doubtful if there will be any balance from this source; and there is practically but the one class of property from which the exemption can be paid. Class 1.

However, the assignor being a "widower" within the true spirit and meaning of the statute, "living with an unmarried minor son" at the time the assignment was made, which is the time that here controls, and not having ceased to so live, he is entitled to receive $500.00 in lieu of a homestead out of the proceeds of the personalty in the hands of the assignee.

The fact that the assignor has re-married will not destroy his right to claim it under this head.

The same obligations rest upon him in reference to his son as did before, and the same reasons for the homestead allowance exist in full force. Not having abandoned his child, he has not forfeited his right.

We will next consider questions presented by mechanic's liens upon the lands assigned. And because the lien of Elder and Tuttle presents, perhaps, the most difficult questions, and for the further reason that the conclusions arrived at may largely decide many of the questions presented in the liens of others, this will be first considered.

On November 7th, 1893, Mr. Reeser, the assignor presented to Elder and Tuttle the following memorandum:

"Charles A. Reeser.
"Innisfallen Greenhouses,
"Seeds, Plants and Bulbs.
"Springfield, Ohio.
         Nov. 7th, 1893.
"Messrs. Elder and Tuttle,
     "City.
"Gentlemen:

"I hereby hand you a list of pine and other fittings I need to use in a greenhouse I am erecting. Please give me your most favorable price, and also state how soon you can furnish the same after I place an order with you.
325 feet 4 inch black pipe.
1600 " 11¼ inch pipe
1-4 inch straight way valve.
1-3 " " " "
1-4 by 4 by 4 by 3 inch Cross Reducing
                   Malleable.
1-4 inch Flangeunion.
1-4 " Elbo Malleable, & &.
         "Yours, very truly,
           "Chas. A. Reeser."

A satisfactory reply was made and the articles therein designated supplied, and the price charged therefor entered upon a

[COPYRIGHT, 1898, BY CARL G. JAHN.]

book account, the last article being furnished on December 2, 1893.

On December 8th, without any other or further conversation or contract, Reeser gave an order for 20 globe valves and other articles that were proper to be used in the construction of a greenhouse, and so he continued to order from time to time such articles as he needed in the construction of his greenhouse until March 12th, 1894.

Whenever any articles were supplied in response to these orders, the customary price was charged, and entered upon the books of said Elder and Tuttle in the form of a running account. It might be added that this running account had some few charges in it that were for articles that were not proper or suitable to go into the erection of a greenhouse, but they were few and of little value.

On January 1st, 1894, Elder and Tuttle sent Reeser a statement of the amount due, and Reeser not having the money, gave his notes for the full amount due in ninety days, and in addition forwarded them a check for the amount the bank would charge to discount the same.

This note being the $458.00 one, was then placed in the First National Bank, for collection, but it seems was never indorsed by Elder and Tuttle.

On February 16th, 1894. Reeser gave a second note for $340.33, due in sixty days, under a like arrangement as the first. This note was placed in the First National Bank, and was endorsed: "Elder and Tuttle".

On April 4th, a mechanic's lien was filed in the recorder's office covering all the articles furnished Reeser from November 24, 1893 to March 12th, 1894. This lien contained a correct description of these two notes. It appears however, that at the time this lien was filed, the $340.33 note had not been returned to Elder and Tuttle, but was held by the First National Bank, under their endorsement.

This lien did not describe the premises by metes and bounds. but gave the following description: "Located on the lot or tract of land owned as affiant is informed and believes, by Charles A. Reeser and described as follows: and known as the Innesfallen Greenhouses, situated in the county of Clark, state of Ohio, and in the city of Springfield, and at the south-east corner of Southern avenue and old Dayton road."

On June 7th, 1894, for fear that this description might not be definite enough, and perhaps for other reasons not disclosed, a second lien was filed describing the premises by metes and bounds. At that time too, the $340.33 note had been returned to them. It may also be added that at the time Elder and Tuttle furnished Reeser with the articles for which a mechanic's lien is sought Reeser's credit was good, and so considered in the commercial world.

A number of objections have been raised as to the validity of this lien.

First. It is claimed that the contract be-

tween the parties is not sufficient to support the lien. That is, that when these articles were furnished Reeser, there was no stipulation that they were to be used in any particular building, or for any particular purpose, and that they were sold to him upon his own personal responsibility, and that there was no intention to make them a charge upon his realty. In order that these objections might constitute a valid defense to this lien, there would need to be such conduct on the part of Elder and Tuttle that a waiver of their right to a lien might be fairly inferred.

In other words, when a material man furnishes suitable material to a person who he knows is erecting a building, the law presumes that the materials are furnished for that building and so accepted by the purchaser, and likewise it will presume that the material man intends to retain the right the law gives him to collect payment for the materials by him furnished.

In Iron Co. v. Murray, 38 Ohio St., 327, the supreme court say: "While it is plain to our minds that the contract which is made essential by this statute to the existence of a mechanic's lien, may be either expressed or implied: and further, that it is not necessary that the contract should stipulate for such lien or, even, that the labor or material should be furnished with an existing intention to perfect a lien on the property. Nevertheless we are satisfied that if such material or labor be furnished upon an understanding or agreement, either express or implied, that no such lien will be asserted, then the right to assert it is waived and cannot be enforced against a subsequent purchaser".

In the case at bar there was no understanding or agreement that the lien would not be asserted.

The first memorandum furnished by Reeser to Elder and Tuttle gave them knowledge of his building, and the articles thereafter ordered being suitable, they had a right to presume they were for such building operations, and not having agreed not to assert their right to a lien, they did not lose their right although they relied largely on his personal responsibily for payment of their claim. The contract in the present case is sufficient to support the lien.

The second claim that is urged against this lien or that will affect a portion of it, is, that all the material was not furnished under the contract: That each order constituted a separate and independent contract, and that therefore all the material that was furnished at a date more than four months prior to the filing of the affidavit, could not be secured by this lien.

"Under the mechanic's lien law, the account is an entirety, whether the work is done under a written contract and the contract is filed for the purpose of securing a mechanic's lien, or whether there is a running account of items furnished from time to time by the material man to the owner of the premises. From the time of the first item of the account it is treated as an entirety * * * and this lien is preserved from the beginning of the account, and the lienholder has four months from the last item to file his lien.

"Two distinct accounts furnished under distinct contracts cannot be tacked together to make a continuous account The lien of each account must be within the four months required by statute. R. & W., Ohio Mechanic's Lien Law, 56.

The difficulty of making a correct application of the law in a case like the present, was fully recognized by the authors of the Ohio Mechanic's Lien Law. (page 60).

In giving the most liberal application to the Mechanic's Lien Law, I have not been able to convince myself that all the material in the case at bar was furnished under one contract, or that the orders were so connected as to make the contract an entirety.

There was no obligation, either legal, moral or equitable at any time for Elder & Tuttle to furnish, or Reeser to receive any other material than that specified in each order as it was given.

The case of Central Trust Co. v. Texas & St. L. R. R. Co., 23. Fed. Rep., 673, is important as showing the construction given by Justice Brewer upon a somewhat similar question.

This was a case where a receiver was appointed for a R. R., and was an application of the Mechanic's Lien Law of Kansas.

The court discusses, what is an "open", or "running" account, and what will constitute a "subsisting" contract, quoting an order made by U. S District Judge Treat, in reference to such matters.

"In reference to the particular order discussed by counsel, my brother Treat has prepared an exposition which may help to a right understanding in future proceedings in this and other cases, which I will read:

"'The various rulings of the court with respect to betterments and wages, not within the respective time stated,—to-wit, six months or otherwise—have rested upon this distinctive proposition: That supplies furnished or services performed under a subsisting contract to which and to the continuance of which the parties were respectively bound, and the termination of said contract did not happen, except within the time limited; or when such a continuing contract was still in force at the appointment of a receiver, the items of such continuing and subsisting contracts would fall within the prescribed rules.

"'No other demands, independent of their nature, incurred before the prescribed time, are to be treated other than as credits at large. If this ruling is enforced there need be no difficulty with respect to what are called 'open and current accounts'.

"'Such accounts must be under subsisting contracts, not to be terminated until within the period of time named; otherwise all items previous to that time must be rejected.

"'This ruling may be subject to an excep-

tion where the local statute gives a lien under a different limitation. In the latter cases difficulties may arise if local decisions are followed, each one of which must depend on its special facts.'

"That is, in order that there shall be a subsisting contract, it must be one binding on the vendor as well as upon the railroad. A mere open, running account does not necessarily come within the purview of that. In dealing with a grocery merchant, for instance, you order separately from day to day, and while, by implied understanding or agreement, there may be an open, running account, yet it is an account terminable at the option of either party at any time. The purchaser may say he will make no further purchases. The merchant may decline to make further sales. It is not, therefore, a subsisting contract. There must be a contract by which the vendor is under obligation to furnish for a definite time; as for instance, if the vendor had contracted to furnish for a period of six months, so much lumber each month at a certain rate, there is a contract which during the six months is binding upon him as well as binding upon the road. It is a subsisting contract enforceable as against both parties. But where there is simply an open, running account, terminable at the instance of either party at any time, it is not within the scope of the order. We think the master fairly interpreted it, and we sustain his construction"

Counsel for Elder & Tuttle has cited Jones v. Swan, 21 Iowa, 181, as sustaining his position that their lien covers all the material by them furnished. As this case was decided while that eminent jurist, John F. Dillon, was a member of the court, and as the law applicable to mechanic's liens is aptly stated I will quote at some length from the opinion:

"From the testimony the court was justified in finding the following facts: Plaintiff is a founder and mechanic. The articles were furnished as charged, commencing on the 2nd of December, 1893, and closing May 23, 1865, the account running continuously through the entire time. The work was done and materials furnished in repairing old and in making new machinery, from time to time, as the owners of the property required, in pursuance of a verbal contract, made about the time the first articles were furnished, under which plaintiff was to make and furnish castings as they were ordered, with the knowledge and understanding that they were to be used in this factory, and where they were in fact used. At this time all the items of the bill were not contemplated, but as additions and changes would be made, other orders would be given, plaintiff acting under the same contract, and defendants doing nothing to lead to any other supposition. The items were charged in plaintiff's books, as he charged other persons, Swan the active partner, frequently calling and ordering the work.

"Upon these facts the court very properly recognized and established plaintiff's lien.

"He is a 'mechanic'or 'artisan'. As such he 'performed' labor' and 'furnished material' in and about the construction and repair of certain 'machinery or fixtures' in defendant's factory. This was a part of the erection or improvement upon the land. And this was all done under a contract with the owner or proprietor of the factory or building, including the land upon which the same was situated.

"To entitle the mechanic or builder to a lien, it is not necessary that every article should be contemplated and specifically named at the time of making the contract. They must, we admit, be furnished under a contract with the owner or proprietor. But if thus furnished, it makes no difference that the items were charged, from time to time, in the 'builder's or mechanic's books, in the same manner that he charged his other customers generally.

"Nor is it necessary that it should be expressly understood that the artisan is to have a lien for his work and materials.

"Such a contract is not made in one case in fifty. Nor does the law contemplate it, in order to make the lien effectual. Such lien attaches, and shall be preferred to all other liens or incumbrances, which become subsequent to the commencement of the building, erection, or improvement.

"When the work is done and material furnished under a contract, the notice is not to be given within ninety days from the doing or furnishing each item, but within ninety days after all shall be furnished or done. The contract is treated as entire, all the items being furnished thereunder. Where there is a continuous, open current account, the cause of action, under the statute of limitations shall be deemed to have accrued as to all on the date of the last item. And so the mechanic's lien attaches at the commencement of his work, and the ninety days for notice commences on the date when all the work or things are furnished or performed. And in all is included the first as well as the last item. Of course, where the work is done under different contracts, or such space intevenes between the different items as to raise the presumption that the work had once ceased and the contract was completed, a different rule would obtain. But the contract once shown, if the work is done, as in this instance, almost daily, the lien continues, as to the owner and subsequent incumbrances, for ninety days from the date of the last item.

"Any other rule would render the lien of the mechanic next to, if not quite, a sham and delusion."

But it will be noticed in this case that materials were furnished in pursuance of a certain contract made about the time the first articles were furnished, under which the castings were to be supplied as they were ordered, and differs therefore materially from the case at bar.

There is no contract, nor is there any evidence from which it might be inferred that when Reeser made one order, he would ever make another; Reeser never said to Elder & Tuttle that he wanted them to furnish certain material for his greenhouse other than as mentioned in his first order.

Thereafter Elder & Tuttle inferred, from the fact that they knew he was building a greenhouse. that the material was for that purpose as each order was supplied, but they had no knowledge how much more might be needed, or that they were to furnish it.

Each order was separate and independent. If Reeser would have said to Elder & Tuttle that he was going to build a greenhouse and wanted them to furnish such articles as he would need, or as he might order from time to time, or if there was anything from which an understanding might be inferred that an order would be followed by another until the work was done or the building completed, other than the mere fact that orders did follow each other; it might be held that the contract was of sufficient entireity to bring all such orders within a mechanic's lien, and that the last item might save the firs.

There must be something more than mere knowledge that a building is being built and the supplying of orders for suitable material, in order to constitute a "continuing", "subsisting", or "entire" contract within the meaning of the lien law.

The materials in the case at bar were not furnished under such circumstances that it can be held that they were furnished in pursuance of a contract, either continuing, subsisting or entire, and all items or orders for material furnished more than four months prior to the filing of the affidavit will be stricken out, as not being filed within the time required by law. Also all unsuitable materials or articles, such as are not ordinarily used in a greenhouse, and were not in fact used in the construction of the greenhouse, should be stricken out.

It is also urged that Elder & Tuttle waived their right to a lien by taking notes for the material furnished, etc.

The evidence is not very clear whether the notes were given and accepted in payment of the amount due. There is no evidence that the account was balanced. Reeser was given a credit by bills receivable. It is welll settled law in Ohio that if the note was given and accepted in payment, that there could be no lien. Crooks v. Finney, 39 Ohio St., 57. The case of Victoria B. & L. Am. v. Kelsey, 11 Bull., 38, decided by the old district court of Hamilton county, is almost identical in its statement of facts, especially as to the taking and indorsement of the notes. Smith J. in the opinion says:

"Another question raised was that inasmuch as the note was given before the mechanic's lien was taken out, it discharged the lien; but we think it can only suspend the lien, and if before the end of four months from the time the work was completed, the note was taken up, there was nothing to prevent Mr. Morgan from taking out his lien. This question was presented in the cases of Steamboat Charlotte v. Hammond, 9 Mo., 59, and it was held that a note given and payable at a future day but within the duration of the lien, will not merge the original debt nor extinguish the lien.

"Both of the notes given in this case matured within the time required to secure the lien, and both were unpaid before the time expired for taking a lien—and then the lien was taken. Morgan was the owner of the claim—though he had endorsed the note, he was still liable as endorser.

"In Steamboat Charlotte v. Kingsland, 9 Mo., 67, it was claimed that the endorsement of the note operated as a discharge, but the court say: 'the receiving a negotiable note in payment of an account and its transfer by an indorsement in blank, and delivery to, one who received it on the faith of a lien, do not extinguish the legal right to enforce the lien by the payee in a suit to the use of the holder.'

"The case of Smith v. Ward, 4 Ia., 112, is cited as tending to support a contrary rule, but in that case it was claimed, that the lien was not waived by the acceptance of the note; but it was intimated in the opinion that if the holder had parted with the entire possession and ownership, the lien would be lost.

"Mr. Morgan in this case had not assigned that note absolutely, but was liable as indorser, and Smith v. Ward refers to another decision by the same court in the same volumn, Hawley v. Warde, 4 Ia., 36, which holds that where the payee of a note was entitled to a mechanic's lien, he does not waive or forfeit his lien by endorsing the note and leaving it for a time with a third party as collateral.

Bernsdorf v. Hardway, 7 O. C. C., 378, is the most recent Ohio decision on this subject. The opinion was rendered by Baldwin, J., of the Cuyahoga circuit, and presents phrases of similarity to the case at bar. In the opinion it is said:

"The furnishing of the slate was done in the latter part of September, 1890. In the latter part of January, 1891, Mr. Hardway gave a note, and exactly for what that note was given there is some controversy. it being claimed on the one side that it was for the precise amount of the two liens claimed, and Hardway saying it was for a general balance of account. But we think the testimony fairly supports the proposition that the note was given for these items in controversy in this case. The note was not paid. It was drawn payable with interest. In March, 1891, Auld & Conger, having once completely slated the house, went back and replaced the slate which had been broken or injured by the painters or other workmen who in the meantime had used the roof, and by means of which use it was injured

"It was claimed in the outset that the

question of the waiving of the lien by the giving of the promissory note, was settled by the decision of the supreme court of our state. There was some testimony in which it was said that the note was spoken of as being taken in payment of that lien, but that was a witness who had no personal knowledge on the subject.

"The testimony substantially was that there was no express agreement, nor were the circumstances such as to imply an agreement that this note should be considered to be in payment of the account, so that under the decisions in this state, that the mere giving of a promissory note for an account, is not payment of the account, should have come to the conclusion on the evidence that, so far as that was concerned, this note was not a payment of the account for the material furnished and labor performed.

"We are referred to a case in 39 Ohio St., page 57, Crooks v. Finney, in which it is held: 'Where a promissory note is given and received in payment of a mechanic's claim for materials furnished and work done in erecting a house under a contract with the owner, the lien of the mechanic is waived.'

"In that case the court was compelled to come to the conclusion that the note was received in payment of the account. The general rule is regard to whether the circumstances under which a note will be taken and considered to be in payment of the claim, has been several times laid down by the supreme court of our state. The case in 4 Ohio St., 61, Merrick v. Boury, is a leading case.

"One of the syllabi reads: 'It is only by force of an agreement of parties, that the giving of an unsealed note by the debtor will be payment of a preceeding debt. The burden of proof is upon the debtor, who must establish the agreement clearly; and the question whether there was such an agreement, is one of fact to be determined by the jury.'

"There was some sligth discussion whether, even if it was in payment, it was not a waiver of the lien; but that matter, if there could have been any question about it, seems to be settled by the present provision of our statute. Section 3187.

"It was suggested that this statute was not then in force. As a matter of fact, this statute was passed on the 5th day of March, 1897. vol. 84, page 46, 47. This decision in 39 Ohio St., was made in 1883.

"It looks as though the legislature, in passing this statute, had in mind this decision of the supreme court But this lien was obtained in 1890 and 1891, after this act was passed.

"We are therefore of the opinion that the giving of the note was very clearly not a waiver of that lien."

The court in this case seems to be in some doubt, whether if the note had been taken in payment, under the present statute, the lien thereby would have been lost.

It is claimed, however, that because at the time this lien was filed the second note for $340.33 was in the possession of the First National Bank, indorsed to them by Elder & Tuttle, that no lien could be acquired as to that amount.

It is not very clear from the evidence just how this note was held by the bank. It was not indorsed "without recourse." Elder & Tuttle were liable as indorsers; and while they did not have possession of it at the time the lien was filed, they certainly recognized their liability thereon, by giving a full and accurate description of it in their affidavit. Before the note was dishonored and long before this action they lifted it.

I have been informed that the late Judge Goode, of our common pleas, held in an action there pending that it was sufficient to retain the right to the lien, if at the time of the suit the material man held the ownership of the note, and that it was not absolutely essential that he held it at the time the lien was filed, provided he still retained an interest in it by way of a liability as indorser, etc,. therefor.

The case of German Bank v. Schloth, 59 Iowa, 316, 13 N. W. Rep., 314, stated the law well on this subject when it says:

"The case under consideration is this: The lien holder transfers the note, which is a negotiable instrument, and when it is dishonored by non-payment of the indorsee, lifts it by payment to the indorsee. Can the lien holder, the payee of the note, after he has received the note from the indorsee enforce the lien? We think he can, for these reasons: He was at no time without interest in the note. He was responsible while it was in the hands of the indorsee as an indorser, and that responsibility was accompanied by the liability of the maker to him.

"The contract of the endorser and maker run together. The endorsee agrees to pay if the maker does not, and the maker is bound to the indorser if he fails to pay the indorsee.

"These are subsisting contracts while the paper is in the hands of the indorsee. Like all other contracts they are only enforceable by action upon default by the parties bound.

"The maker all the time the note is in the hands of the indorsee, is bound by his contract to the payee. We conclude therefore, that the payee does not cease to become a party to the contract so as to waive any liens which accompany the note. This position is strengthened by the consideration that upon default of the maker, the indorsee acquires the note under no new contract.

"When he lifts it, it becomes again fully and exclusively his property, and he is authorized to strike out his endorsement. It appears that the endorsee's interest in the note is not of such exclusive character as to deprive the endorser of all interest and title therein. The title of the indorsee is so qualified as to permit the endorser to hold an interest in the note and a con-

ditional title which becomes absolute upon payment made by him after dishonor of the paper.

"Now surely no reason exists for a rule which defeats the lien accompanying the note when it is re-acquired by the indorser."

Of course, if at the trial Elder & Tuttle had not re-acquired this note, and they had parted with all right, title and interest in it, in any way whatever, they could not include it in their lien.

I do not believe that in the case at bar the facts will warrant a holding that the notes were received in payment, or that the right of the lien was lost by negotiation of the $340.33 note.

See R. & W.'s Ohio Mechanics L. Law, pps. 34-35 and 69-70.

It is also argued the description of the premises in this lien is defective, in that it is vague, indefinite and uncertain.

"The best rule,' says Phillip on Mechanic's Lien Law, quoted by R. & W. Ohio Mechanic's Lien Laws, p. 72, "to be adopted is, that if there appear enough in the description to enable a party familiar with the locality to identify the premises intended to be described with reasonable certainty to the exclusion of others, it will be sufficient.

"There is great reluctance to set aside a mechanic's claim merely for loose description, as the statute, generally, contemplates that the claimants prepare their own papers; and it is not necessary that the description be either full or precise."

Applying the rule here laid down, the description appears to be sufficient. The Innisfallen Greenhouses constituted a well known plant. They are situated at the south-east corner of Southern avenue and the old Dayton road, in the city of Springfield, Clark county, Ohio, and comprise a dwellinghouse, stables, greenhouses and other out-buildings. Although the ground was purchased in several tracts, it is not laid out into lots in an accepted plat, and was all used in the conduct of the business of a floriculturist.

The liens of demarkation were not observable. Without an examination in the recorder's office, no one would know that there was more than one tract, and then he might need the surveyor to point out the boundaries.

The description is hardly such as I would commend, but it is sufficient to advise purchasers and others of the lien and the land upon which it was claimed.

Reeser having made an assignment before the lien was filed, and the rights of all the parties having become in a large degree fixed by that act, it is probable that a less definite description will answer in this case than would otherwise be required.

The next objection that is made is that the affidavit does not state the contract or the amounts and the times of payment to be made thereunder.

The affidavit sets forth a detailed statement of the materials furnished, with the amounts charged for each item, and the time when it was furnished.

And that the same "were furnished under and by virtue of a contract not in writing between the said Elder & Tuttle and the said Chas. A. Reeser."

There is some question under section 3185 as it now stands, where the contract is not in writing, whether it is absolutely necessary to make a statement of "the amounts and times of payment to be made thereunder."

Section 3185, after enumerating other matters that the affidavit must contain, continues: "A copy of the contract, of it is in writing, a statement of the amount and times of payment thereunder * * * ."

The first statute in which anything is said upon this particular matter is found in 74, O. L., 169, and the language there is "a copy of the contract if it be in writing, a statement of the amount and times of payment to be made thereunder."

Thus it will be seen when the act was amended; in its present form the clause "and if it be not in writing" was stricken out. And the statute now contains no positive injunction that even the substance of a verbal contract be given in the affidavit.

This omission by the legislature may be the result of an accident, but I must presume that it was done with a purpose, and the only purpose that I can conceive, is, that where the contract is not in writing, that no "statement of the amount and times of payment to be made thereunder," is required in the affidavit for a lien.

This may have been stricken out for the reason that often in a verbal contract these matters are not of such definiteness that they can be shown to a certainty, and also generally they are of such small amounts that they are not divided into payments to be made from time to time, but there is usually but one payment, due at the time the work is done or material furnished.

And the legislature probably had in mind job contracts, or such as are for large amounts, and are usually made in several payments, at different times, to correspond to the progress of the work.

Where the contract is not in writing the presumption is that payments are entire and the time, cash.

In the case at bar, the itemized statement shows that the articles were supplied at different times and a charge made for each, and as the object of requiring a statement of the amount and time of payment is "to inform other lien holders, incumbrancers or purchasers as to the justice of the claimant's lien and its nature and character", (R. & W. Ohio Mechanic's Lien Law, 70), the information intended by the statute is probably supplied. Furthermore it should be remembered that the assignment was made before the lien was filed, and many of the rights of the parties become fixed by that act.

I doubt very much where the affidavit states, what is supported by the evidence,

that the contract is not in writing, that "a statement of the amount and time of payment to be made thereunder", is in any case required, at least in the present case I am willing to hold that it is not required.

This concludes, I believe, the question made on the Elder & Tuttle lien.

In reference to the lien of Woliston, Wilder & Co. I think that the evidence is sufficient to constitute the contract, a continuing one of sufficient entirety, that the lien will include the first item in the account. The testimony adduced shows that Reeser came to Woliston, Wilder & Co. with a memoranda of materials that he then needed, and said he desired prices on them, adding that he was going to build four or five greenhouses, and that he wanted them to furnish the lumber, which they did as he ordered it. This makes the case very similar to Jones v. Swan, 21 Iowa, 181 largely quoted from herein. in the consideration of the Elder & Tuttle lien.

The evidence in reference to the receipt of Reeser's note by Wooliston, Wilder & Co. in payment is less strong than that in the Elder Tuttle matter, and under what was said there it will be held that the lien was not lost for that reason.

In this case the note was given payable four months after its date, and this it is claimed extended the time beyond the period at which a lien could be filed.

If this note had been given in full payment at the time the last item in the account was furnished, there might be something in the claim, but it was not given at the close of their account, for it is dated December 1, 1893, and the last item is of the date of March 2, 1894.

The note was due April 12, 1894, the lien could have been filed any time up to July 2, 1894, almost three months after the note was due. So it is easily seen there is nothing in this claim.

It is also said that the affidavit states that the materials were furnished "in and about the alteration and repair of a greenhouse building", while the evidence shows that they were furnished in the erection of five greenhouse buildings, all connected, and that this will make the lien defective. It occurs to me that this is not a sufficient variance to affect the lien. It is sometimes quite difficult to distinguish between what is an alteration and an erection.

It doesn't matter as I can see, to any one whether it was an erection, or an alteration, both being included in the statute, providing the materials were furnished for the purposed improvement, and were in fact used in the building, etc., as is admitted in this case.

No objection was made as to the lien of F. Desormoux & Son, and the evidence supporting the same, it will be allowed.

I believe this disposes of the questions made in this cause, and counsel will prepare an entry in accordance with the findings upon the various matters.

Oscar T. Martin, for Assignor.

A. H. Kunkle, for Assignee.
Keifer & Keifer, for Elder & Tuttle.
Hagan & Hagan, for F. Desormoux & Son
D. Z. Gardner, for Woliston, Wilder & Co.
F. R. Geiger, John C. Barrett, V. G. Smith, for General Creditors.